# EXHIBIT A

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 14

FILED
4/18/2025 4:07 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH04354
Calendar, 14
32344331

FILED DATE: 4/18/2025 4:07 PM  2025CH04354

| | | |
|---|---|---|
| 2120 - Served | 2121 - Served | 2620 - Sec. of State |
| 2220 - Not Served | 2221 - Not Served | 2621 - Alias Sec of State |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| **Summons - Alias Summons** | | **(03/15/21) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

Terrance Moss on behalf of himself and the
proposed class,



_____ Plaintiff(s)

v.

Case No.   2025CH04354 _____

Klover Holdings, Inc.

_____ Defendant(s)

Illinois Corp. Service Co., Registered Agent
801 Adlai Stevenson Dr., Springfield, IL 62703

_____
Address of Defendant(s)

Please serve as follows (check one):   ○ Certified Mail   ⦿ Sheriff Service   ○ Alias

### SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached.
You are summoned and required to file your appearance, in the office of the clerk of this court,
within 30 days after service of this summons, not counting the day of service. If you fail to do so, a
judgment by default may be entered against you for the relief asked in the complaint.

### THERE IS A FEE TO FILE YOUR APPEARANCE.

**FILING AN APPEARANCE: Your appearance date is NOT a court date.** It is the deadline
for filing your appearance/answer. To file your appearance/answer **YOU DO NOT NEED
TO COME TO THE COURTHOUSE, unless you are unable to eFile your appearance/
answer.** You can download an Appearance form at http://www.illinoiscourts.gov/Forms/
approved/procedures/appearance.asp. After completing and saving your Appearance form, you can
electronically file (e-File) it with the circuit clerk's office.

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 3

APR 2 2 2025

FILED DATE: 4/18/2025 4:07 PM  2025CH04354

**Summons - Alias Summons**                                              (03/15/21) CCG 0001 B

**E-FILING:** E-filing is now mandatory with limited exemptions. To e-File, you must first create an account with an e-Filing service provider. Visit http://efile.illinoiscourts.gov/ service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-Filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit www.illinoislegalaid.org.

**FEE WAIVER:** If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www.illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

**COURT DATE:** Your court date will be sent to your e-File email account or the email address you provided to the clerk's office. You can also call or email the clerk's office to request your next court date. You will need to provide your case number OR, if unknown, the name of the Plaintiff or Defendant. For criminal case types, you will also need to provide the Defendant's birthdate.

**REMOTE APPEARANCE:** You may be able to attend this court date by phone or video conference. This is called a "Remote Appearance". Call the Circuit Clerk at (312) 603-5030 or visit their website at www. cookcountyclerkofcourt.org to find out how to do this.

Contact information for each of the Clerk's Office locations is included with this summons. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

⦿ Atty. No.: 99806 _____

○ Pro Se 99500

Name: Courtney R. Brown | Carney Bates & Pulliam

Atty. for (if applicable):

Plaintiff _____

Address: One Allied Drive, Suite 1400

City: Little Rock

State: AR   Zip: 72202

Telephone: 501-312-8500

Primary Email: cbrown@cbplaw.com

Witness date _____

4/18/2025 4:07 PM Mariyana T. Spyropoulos

Mariyana T. Spyropoulos, Clerk of Court

☐ Service by Certified Mail: _____

☐ Date of Service: _____
(To be inserted by officer on copy left with employer or other person)

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 2 of 3

FILED DATE: 4/18/2025 4:07 PM   2025CH04354

## GET YOUR COURT DATE BY CALLING IN OR BY EMAIL

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

### CHANCERY DIVISION
Court date EMAIL: ChanCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5133

### CIVIL DIVISION
Court date EMAIL: CivCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5116

### COUNTY DIVISION
Court date EMAIL: CntyCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
Court date EMAIL: DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-6300

### DOMESTIC VIOLENCE
Court date EMAIL: DVCourtDate@cookcountycourt.com
Gen. Info:   (312) 325-9500

### LAW DIVISION
Court date EMAIL: LawCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-5426

### PROBATE DIVISION
Court date EMAIL: ProbCourtDate@cookcountycourt.com
Gen. Info:   (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
Court date EMAIL: D2CourtDate@cookcountycourt.com
Gen. Info:   (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
Court date EMAIL: D3CourtDate@cookcountycourt.com
Gen. Info:   (847) 818-3000

### DISTRICT 4 - MAYWOOD
Court date EMAIL: D4CourtDate@cookcountycourt.com
Gen. Info:   (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
Court date EMAIL: D5CourtDate@cookcountycourt.com
Gen. Info:   (708) 974-6500

### DISTRICT 6 - MARKHAM
Court date EMAIL: D6CourtDate@cookcountycourt.com
Gen. Info:   (708) 232-4551

**Mariyana T. Spyropoulos, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

and other case information, please visit our Online Case Search: 1-2 Filed: 05/22/25 Page 5 of 45 PageID #:1235 AM
and search for your case: https://casesearch.cookcountyclerkofcourt.org

FILED
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH04354
Calendar, 14
32338476

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
CHANCERY DIVISION

| | |
|---|---|
| TERRANCE MOSS, individually and on behalf of all others similarly situated, | |
| Plaintiff, | CASE NO.: 2025CH04354 |
| v. | CLASS ACTION |
| Klover Holdings, Inc., | JURY TRIAL DEMANDED |
| Defendant. | Hearing Date: 6/17/2025 9:30 AM<br>Location: Court Room 2301<br>Judge: Quish, Clare J |

## CLASS ACTION COMPLAINT

Plaintiff Terrance Moss, a Staff Sergeant in the U.S. Army ("Plaintiff" or "Sgt. Moss"),
on behalf of himself and all others similarly situated, alleges the following based upon personal
knowledge as to himself, upon information and belief, and the investigation of his counsel as
to all other matters, and brings this Class Action Complaint against Klover Holdings, Inc.
("Klover" or "Defendant"), and alleges as follows:

### I.   NATURE OF THIS ACTION

1.    This Complaint seeks to protect active-duty military service members from
Klover's predatory lending practices that violate the Military Lending Act, 10 U.S.C. § 987, *et
seq.* ("MLA") and the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"). The MLA
was enacted to protect United States active-duty service members and their dependents
(collectively, "Covered Members") from predatory lending. Excessive debt endangers our
nation's military readiness and is detrimental to service-member retention, morale, household
stability, security clearances, and career advancement. Notably here, Klover makes no effort

1

FILED DATE: 4/18/2025 11:35 AM 2025CH04354

to fulfill its duty to determine whether it is lending to Covered Members or to provide legally mandated protections for them.

2.      Klover is in the business of payday lending through an earned wage access ("EWA") product—it makes funds available to its customers, who repay Klover principal and finance charges (including expedite fees and so-called "tips") on payday. Its business model entails making high-frequency, short-term, and high-cost loans to consumers living paycheck to paycheck. Despite advertising its loans as "no interest" and promising no mandatory fees, in practice, Klover regularly takes in **triple- and quadruple-digit** finance charges for the loans it issues. Many of Klover's loans to Plaintiff had astronomical interest rates, with one such loan exceeding **1,230%** APR. The end result is a financial product that extracts exorbitant fees from workers, encourages serial usage and dependance on the costly loans, worsens workers' financial circumstances, and traps them in a cycle of debt.

3.      Plaintiff, a Staff Sergeant in the U.S. Army, has used Klover's cash advance product for years. By virtue of the sky-high fees charged for early access to his salary, Klover has extended consumer credit to Plaintiff on numerous occasions in violation of the MLA and TILA.

4.      Borrowing money that is repaid on payday is not an innovation; it is a loan. As EWA products have become more popular, the parallels to payday lending are striking. Like payday loans, EWA products can trap users in a cycle of reborrowing that increases their financial distress, all in service of generating revenue for predatory lenders. Considering the substance of the transactions, Defendant's cash advance transactions are in reality consumer credit.

5.      In violation of the MLA, Defendant uses its cash advance product to saddle Covered Members with charges that, on average, yield a military annual percentage rate ("MAPR") well in excess of the MLA's legal limit.

6.      Klover's consumer credit agreements violate the MLA in at least five ways: By (1) charging interest above the 36% statutory MAPR cap; (2) failing to provide any credit disclosures required by the MLA; (3) including a purported class action ban and waiver of jury

2

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

trial; (4) including a mandatory binding arbitration clause; and (5) using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. §§ 987(b), (c) & (e)(2), (3), (5).

7.      Klover systematically violates the Truth in Lending Act by failing to make required disclosures concerning the interest rate charged as part of its loan agreements with consumers.

8.      Among the abusive lending practices that the MLA was designed to curb was predatory payday loans made to servicemembers.[1] In a Department of Defense report on predatory lending practices affecting military members (the "Report"), the egregious lending practices prevalent in the payday lending industry were highlighted.[2] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the most heavily targeted communities in their respective states."[3] Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers over $80 million in abusive fees annually as of 2005.[4]

9.      Klover's business practices violate the MLA and TILA and are part of a systematic nationwide policy and practice. Sgt. Moss seeks to hold Defendant accountable for its actions and prevent its predatory lending practices from continuing.

## II.    PARTIES

10.     Plaintiff is an individual, over 18 years of age. At all times relevant, Sgt. Moss was a natural person and resident of Pierce County, Washington. Sgt. Moss has been an active-duty service member in the United States Army since January 2017.

11.     Defendant Klover Holdings, Inc., is a Delaware corporation with its headquarters in Chicago, Illinois. Klover has offered and entered into loan agreements with

---

[1] *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents*, U.S. DEP'T OF DEFENSE (Aug. 9, 2006), available at https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.
[2] *Id.* at 10–16.
[3] *Id.* at 10–11.
[4] *Id.* at 11.

3

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

consumers, including Covered Members, since at least 2019, entering into millions of credit transactions, nationwide.

## III.    TOLLING OF THE STATUTE OF LIMITATIONS

12.    The Servicemember Civil Relief Act ("SCRA"), 50 U.S.C. § 3901, *et seq.*, tolls any and all limitations or repose periods for all active-duty military members, including those similarly situated to Sgt. Moss, until their active-duty service concludes. Specifically, § 3936(a) of the SCRA provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

## IV.    JURISDICTION AND VENUE

13.    Venue is proper in this Court pursuant to 735 ILCS 5/2-101 because Defendant Klover is headquartered in Cook County and the transactions or some part thereof that give rise to this action occurred in Cook County, Illinois.

14.    This Court has jurisdiction over Klover, because it, at all times relevant herein, was qualified to do business and regularly conducted business in Illinois.

15.    Additionally, Klover agreed in the terms and conditions posted on its website that any judicial proceeding related to Klover's services will be brought in the federal or state courts of Cook County, Illinois.

## V.    LEGAL BACKGROUND

### A.    The MLA Was Designed to Curb Predatory Payday Loans to Covered Members

16.    The DoD's Report on lending practices discussed the payday lending industry at length.[5] The Report noted that payday lenders were "heavily concentrated around military bases," with statistics showing that communities with military installations "rank among the

---

[5] Report, *supra* n.1.

4

most heavily targeted communities in their respective states."[6]

17.     Military populations were targeted for an obvious reason: "active-duty military personnel are three times more likely than civilians to have taken out a payday loan," with such loans costing servicemembers millions in abusive fees.[7] Moreover, the military payment architecture, and the Uniform Code of Military Justice to which servicemembers are bound, make them particularly vulnerable to predatory payday loans:

> Check-holding, a central feature of payday loans, is particularly risky for military borrowers. Every payday loan involves a prospective "bad" check. Military borrowers are required to maintain bank accounts in order to receive direct deposit of military pay and are subject to the Uniform Code of Military Justice that penalizes deliberately writing a check not covered by funds on deposit. Borrowers become trapped in repeat borrowing or renewals of loans in order to keep the check used to obtain the loan from bouncing, a key reason that payday loans are debt traps.[8]

18.     While the precise EWA product offering was developed somewhat recently, its genre (small-dollar, short-duration, high-cost loans) is nothing new. In 2006, the DoD noted military "borrowers encounter[ed] a booming virtual market of small loan offers, payday loans, and 'military loans' via the Internet."[9] Those loans, like Klover's, "are delivered and collected online through electronic fund transfer."[10]

19.     The Report noted key similarities between the various predatory lending products—including payday loans and internet loans—that target the military, which accurately encapsulate Klover's business model:

> (1) Predatory lenders seek out young and financially inexperienced borrowers who have bank accounts and steady jobs, but also have little in savings, flawed credit or have hit their credit limit. These borrowers are less likely to weigh the predatory loan against other opportunities and are less likely to be concerned about the consequences of taking the loan.

---

[6] *Id.* at 10–11.

[7] *Id.* at 11.

[8] *Id.* at 14. To be sure, EWA providers like Klover do not collect physical checks from their customers at loan initiation but instead take a virtual check by requiring Covered Members to authorize automatic debits from bank accounts to repay their loans.

[9] *Id.* at 15.

[10] *Id.* at 16.

5

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

(2) Predatory lenders make loans based on access to assets (through checks, bank accounts, car titles, tax refunds, etc.) and guaranteed continued income, but not on the ability of the borrower to repay the loan without experiencing further financial problems.[11]

(3) . . . Increasingly the Internet is used to promote loans to Service members.

(4) Predatory products feature high fees/interest rates, with some requiring balloon payments, while others pack excessive charges into the product. The result of their efforts is to obfuscate the comparative cost of their product with other options available to the borrower.

. . .

(6) Predatory lenders attempt to work outside of established usury limits, either by attempting to obtain exemptions from federal and state statutes or by developing schemes designed to circumvent existing laws.[12]

20.    The Report further found "high interest loans, whether provided as a payday loan, military installment loan, or as a result of unscrupulous automobile financing can leave a Service member with enormous debt, family problems, difficulty maintaining personal readiness and a tarnished career."[13] As if being trapped in a debt cycle is not bad enough, some servicemember victims of payday and other lenders experienced disciplinary action (ranging from reprimands to "loss of promotions and separation from the military") as a result of their financial hardship.[14]

21.    Drawing from the bountiful evidence of servicemember abuse at the hands of predatory lenders, the DoD concluded it could not "prevent predatory lending without assistance from Congress, the state legislatures, and federal and state enforcement agencies."[15]

22.    To curb usurious interest rates, excessive annual percentage rates (APRs), and bogus fees, the DoD requested legislation that would prevent lenders from preying on service members and endangering the nation's military readiness.[16]

---

[11] To that end, lenders' "use of checks, access to bank accounts, [and similar other methods of extracting repayment] pressure the borrower to consider loan payments as being their top priority." *Id.* at 44.

[12] *Id.* at 21–22.

[13] *Id.* at 39.

[14] *Id.* at 41–42.

[15] *Id.* at 46.

[16] Specifically, the DoD requested legislation protecting Service members "from unfair, deceptive lending practices and usurious interest rates and to require uniform disclosure of credit and terms. Specifically, lenders should not be permitted to base loans on prospective bad checks, electronic

6

FILED DATE: 4/18/2025 11:35 AM    2025CH04354

23.     The American Bar Association and others expressed support for the DoD's request, noting the urgent need for remedial Congressional action to curb predatory loan practices harming Service members. The legislation requested was supported by the DoD, military and veterans organizations, legal aid organizations, consumer advocacy groups, faith-based organizations, and of course lawmakers.

24.     Congress answered the call and passed the MLA to protect Covered Members from unfair, deceptive, and excessively priced loans.

**B.    The Military Lending Act**

25.     In the wake of the DoD's investigations, in 2006, the Military Lending Act, 10 U.S.C. § 987 *et seq.*, was enacted.

26.     The MLA makes it unlawful for a creditor to "impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a Covered Member or a dependent of a Covered Member." 10 U.S.C. § 987(b).

27.     The MLA also requires mandatory disclosures in "consumer credit" [17] transactions with Covered Members, which include:

- A statement of the annual percentage rate of interest applicable to the extension of credit, 10 U.S.C. § 987(c)(1)(A);

- Any disclosures required under the Truth in Lending Act, 10 U.S.C. § 987(c)(1)(B); and

- A clear description of the payment obligations of the member or dependent, as applicable, 10 U.S.C. § 987(c)(1)(C).

28.     Additionally, the MLA prohibits creditors from including provisions in a consumer-credit transaction that require the Covered Borrow to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e).

---

access to bank accounts, mandatory military allotments, or titles to vehicles. All costs involved in borrowing should be included in interest rate calculations and disclosures. Laws and regulations must be changed to close regulatory loopholes that leave non-resident military borrowers unprotected in many states." *Id.*

[17] Under the MLA, consumer credit is defined as "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge or payable by written agreement in more than four installments and outside the ambit of any of the identified exceptions.

FILED DATE: 4/18/2025 11:35 AM 2025CH04354

29.     The MLA also makes it unlawful to charge a Covered Member any penalty or fee for prepaying all or part of the loan. 10 U.S.C. § 987(e).

30.     The MLA also prohibits creditors from using a check or other method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. 10 U.S.C. § 987.

### C.     The Truth in Lending Act

31.     The Truth in Lending Act, codified at 15 U.S.C. § 1638, protects consumers by, *inter alia*, (i) requiring lenders to clearly disclose all terms and costs associated with loans, (ii) allowing borrowers to easily compare different credit options, and (iii) preventing predatory lending practices by making loan details transparent and standardized. In essence, TILA promotes informed use of consumer credit by providing full disclosure of loan terms.

32.     Under TILA, creditors are required to make certain disclosures when participating in closed-end credit transactions, such as those Klover offers here. Klover fails to make any of the following required disclosures:

- "The 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(2)(A);
- "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *Id.* at § 1638(2)(B);
- "The 'finance charge', not itemized, using that term," *id.* at § 1638(3);
- "The finance charge expressed as an 'annual percentage rate', using that term," *Id.* at § 1638(4);
- "The number, amount, and due dates or period of payments scheduled to repay the total of payments," *Id.* at § 1638(6);
- "Descriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price' as specified by the Bureau," *Id.* at § 1638(8);
- "Where the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," *Id.* at § 1638(9);
- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge," *Id.* at § 1638(11); and

8

FILED DATE: 4/18/2025 11:35 AM    2025CH04354

- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties," *Id.* at § 1638(12).

## VI.    FACTS

### A.    The Earned Wage Product Market and Klover

#### i.    EWA Products Charge High Fees and Wreak Havoc on Borrowers' Financial Health

33.    A significant driver of demand for consumer credit and financial products stems from the mismatch between when a family receives income and when they pay expenses. Employees generally provide services before being paid for their labor and are typically paid in arrears on a biweekly or semi-monthly cycle. To meet liquidity challenges, consumers have for years turned to credit cards, personal installment loans, and payday loans.

34.    Recently, an old product with new packaging—coined "earned wage access" or "earned wage advance" ("EWA")—has been created and offered to consumers to address the same need. While marketed as a novel financial technology ("fintech") device, in practice, EWA products are garden variety cash advances.

35.    EWA products provide workers, before their payday, with a portion of their earned but unpaid wages or to funds that purport to equal or approximate a portion of their unpaid wages. Loaned funds are repaid via automated withdrawal from the consumer's bank account.

36.    Defendant Klover is one such fintech company that provides an EWA advance service, which it calls "Klover advance" or "Balance Advance." Klover markets its advances as "a cash advance from the Klover app. You can access up to $200 – even if your payday is 2 weeks away." Klover has characterized its cash advances as "zero interest" with "no late fees" and "no credit checks."

37.    To repay these loans, users must link their bank account to their Klover profile and authorize automated debits from their linked external bank account on the scheduled repayment date.

9

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

38.     EWA providers advertise their products as "free" or "no interest" while obscuring the ways in which they bilk consumers for fees and other finance charges that add up to loan-shark rates.

39.     Klover, like its EWA provider competitors, is generally paid through (1) expedite fees, (2) so-called "tipping," and (3) by selling customer data to partner institutions.

40.     First, **expedite fees** (described by Klover as "Express Fees") are fees charged to provide instant access to loan funds. For advances, Klover charges between $1.99 and $19.99 for access to advances.

41.     The actual cost to provide customers with instant access to funds is less than $0.05.[18]

42.     The speed of access to funds is an essential and defining aspect of EWA products. They are designed to address—and marketed as addressing—what is generally a less-than two-week liquidity problem.

43.     Klover's website, app, and marketing advertise instant or same-day access to Klover advances. For example, Klover tells customers they can receive "instant" cash that is "amazing and fast" and "fast and easy." The title of the Klover app is "Klover – *Instant* Cash Advance" and Klover tells users they can "Pocket your cash in minutes" in the description of the app found in the Apple App Store. Likewise, Klover's homepage includes in bold text: "Get your advance now."

44.     Klover intentionally advertises its cash advance product to consumers with limited and poor credit and people living paycheck to paycheck. Indeed, many of its advertisements encourage consumers to loan small amounts (less than $100.00) to pay for living expenses (like gas and medical copays) or emergency expenses.

45.     In its advertisements for fast cash, Klover does not include information about the Express Fees users must pay to receive their loan funds instantly. Instead, users who

---

[18] *Simple, Transparent, Uniform Pricing for All Financial Institutions*, THE CLEARINGHOUSE (showing cost of RTP instant credit transfer at $0.045), available at https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/rtp_-pricing_02-07-2019.pdf.

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

respond to Klover's advertising and download the Klover – Instant Cash Advance app are not presented with meaningful, conspicuous disclosures of the Express Fees until they have already connected their bank account and begun the process of requesting a cash advance.

46.     While expedite fees are notionally optional and users can use an EWA product without paying one, they are difficult to access and negate their usefulness to consumers. For instance, consumers who do not pay the fee have to wait up to three business days to receive the loan funds that Klover promises "instantly," "fast and easy."

47.     This delay is problematic for Klover's intended users, consumers living paycheck to paycheck who turn to EWA providers for the precise reason that their need for cash is urgent and cannot wait.

48.     Indeed, a recent study of Klover's direct EWA competitors revealed that the average loan term for EWA loan products was only 10 days.[19] Consumers who cannot wait ten days to access their wages certainly will pay whatever fees an EWA provider charges to obtain their funds as quickly as possible. As a result, the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement.[20]

49.     Turning to the second type of fee, "**tips**" are simply additional funds the lender prompts the user to pay.

50.     These purported "tips" serve no purpose whatsoever to Klover customers taking out loans and instead go directly to Klover's bottom line.

51.     EWA providers like Klover deploy techniques borrowed from behavioral economics to pressure and nudge users into tipping each time they obtain an EWA loan. For example, the California Department of Financial Protection and Innovation ("DFPI") listed

---

[19] Lucia Constantine, Christelle Bamona, Sara Weiss, *Not Free: The Large Hidden Costs of Small-Dollar Loans Made Through Cash Advance Apps*, CTR. FOR RESPONSIBLE LENDING, at 10 (Apr. 2024) (hereinafter "*Not Free*").
[20] One recent survey found 79% of EWA users typically paid expedite fees to receive funds faster. *Not Free, supra* note 19, at 3. Likewise, the Consumer Financial Protection Bureau found 96% of fees paid by consumers using employer-integrated EWA providers were for expedite fees. Consumer Financial Protection Bureau, Data Spotlight: Developments in the Paycheck Advance Market (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

"multiple strategies that lenders use to make tips almost as certain as required fees," including "[s]etting default tips and using other user interface elements to mak[e] tipping hard to avoid; [m]aking it difficult to set a $0 tip or not advertising that a particular payment is optional; and [c]laiming that tips are used to help other vulnerable consumers or for charitable contributions."[21]

52.     Klover weaponizes these strategies against its customers to secure tips, and to great effect. A recent data summary found that EWA providers that request tips receive them in 73% of transactions, on average $4.09 in tips per transaction.[22] An example tip screen Klover shows its customers is shown below:



53.     One of Klover's competitors—who offers a substantially similar EWA product and deploys the same strategies used by Klover in soliciting tips—said in public testimony that

---

[21] *2021 Earned Wage Access Findings*, CAL. DEP'T FIN. PROTEC. & INNOVATION, at 61–62 (March 2023), https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/PRO-01-21-ISOR.pdf (hereinafter "DFPI Findings")

[22] *Id.* at 62.

FILED DATE: 4/18/2025 11:35 AM 2025CH04354

40% of its revenue comes from tips alone.[23] Another of Klover's competitors—who likewise offers a materially similar EWA product for which it solicited tips—reported receiving more than $56,000,000 in tips in 2023 alone, approximately 22% of the company's revenue for that year.[24] Upon information and belief, Klover receives millions of dollars annually in so-called "tips"/"voluntary contributions."

54.      When properly viewing EWA products' expedite fees and tips as costs of credit (*i.e.* finance charges), the annual percentage rates (APR) for these loans are eye-popping.

55.      A recent study found the average APR imposed by EWA providers is 334%, in line with payday loans:

### Total cost of using earned wage access products is close to that of payday loans

The average APR for earned wage access advances is over 330%, according to 2021 data on transactions across five companies. Of the 5.8 million transactions completed by tip-based companies, 73% included tips.

*Annual Percentage Rates (APRs) help compare the total cost of borrowing money, including interest and fees:*

| | |
|---|---|
| New car loans | 7% |
| Credit card plans | 21% |
| Wage-based cash advances that don't request tips | 331% |
| Wage-based cash advances that request tips | 334% |
| Payday loans | 353% |

Chart: Erica Yee, CalMatters • Source: national average APRs for new car loans and credit card accounts with finance charges (2023 Q1) from the Federal Reserve; state average APRs for earned wage access products and payday loans (2021) from the CA Dept. of Financial Protection & Innovation • Get the data • Created with Datawrapper

56.      The APR received by Klover for its cash advance product is similar and at times **much higher**. As shown below, Klover issued cash advance loans to Plaintiff that often exceeded 300%. And at least one of its loans to Plaintiff had an APR of **1,240%**.

---

[23] Vt. House Comm. on Com. and Econ. (2023, February 14), at 2:16:45, available at https://www.youtube.com/clip/Ugkx7fEU-NXc2ZqgurJSRZTHXm_rpCNHzVcU.
[24] *Dave Inc. Form 10-K*, available at https://investors.dave.com/static-files/26e2fc51-3b9e-432b-9b70-37b7e44cadac (last visited Mar. 13, 2025).

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

57.     Ironically, Klover and other industry participants market their products as a low-cost alternative to payday loans.[25]

58.     In truth, Klover is a wolf in sheep's clothing: extending loans with APRs far *exceeding* the exorbitantly-priced payday loan products it claims to replace.

· 59.     Indeed, the EWA "business model capitalizes on most borrowers' financial precarity, and the user interface of these products makes paying a fee . . . difficult to avoid."[26]

60.     The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and creates an ever-increasing reliance on emergency funds from—and the fees that come with—EWA loans.

61.     A Center for Responsible Lending ("CRL") analysis found consumers who used EWA products took out advances repeatedly, with many taking advances on the same day or the day after repayment and were consequently more likely to overdraft their accounts and be forced to pay overdraft fees. Specifically, the CRL found that 27% of EWA users take out at least 25 loan advances a year, and for 33% of users, the vast majority (80%) of their borrowing is followed by reborrowing within two weeks.[27] This suggests receiving a reduced paycheck (*i.e.*, reduced to pay back EWA loans and fees) necessitated taking out more advances in the following pay period.

62.     Another CRL study found that using EWA products is closely correlated with overdraft fees. "Overdrafts on consumers' checking accounts increased 56% on average after use of an advance product."[28]

    ii.     **Klover Encourages Users to Take Out Loans from Several EWA Providers Simultaneously (*i.e.*, "Loan Stacking")**

63.     As noted above, Klover also makes money from selling its customer data to

---

[25] In the description of the Klover – Instant Cash Advance app in the Apple app store, Klover includes a disclaimer claiming: "We are NOT a payday loan[.]" Likewise, Klover claims it charges "No interest" and "no late fees" while failing to mention the Express Fees it charges consumers for "instant" access to funds.

[26] Candice Wang, Lucia Constantine, Monica Burks, Yasmin Farahi, *A Loan Shark In Your Pocket: The Perils of Earned Wage Advance*, CTR. FOR RESPONSIBLE LENDING, at 7 (Oct. 2024).

[27] *Id.*

[28] *Not Free, supra* note 19, at 6.

14

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

partner institutions (for targeted advertising) and otherwise serving users advertising content through the Klover – Instant Cash Advance app.

64.   To that end, Klover gamifies its app with its "Klover *Points Program*." According to Klover, users "[e]arn points for sharing your data and completing activities in the Klover app."[29] The Klover website describes how to earn points as follows:



*Id.*

65.   Notably, Klover prominently features other EWA providers' products (1) in the advertisements shown to its users to earn points, and (2) as "partner offers." Advertisements and offers from EWA providers like EarnIn and Cleo[30] are shown to users to entice them to use EWA products *in addition to* Klover's. Users who watch these advertisements or sign up to use EarnIn and Cleo are rewarded with "points" which "unlock bigger cash advances" from Klover.[31]

66.   Many users who follow Klover's prompts and dutifully sign up for and take out cash advances from other EWA providers end up in an ever-worsening financial condition. With more outstanding payday loans each pay period, workers end up paying escalating fees

---

[29] *Klover Points Program*, https://www.joinklover.com/earn-points (last visited Apr. 12, 2025).
[30] Both EarnIn and Cleo have also been sued in class actions brought by servicemembers for violating the MLA through their EWA loan products which (as is the case with Klover) carry interest rates many multiples above the legal limit.
[31] *Klover Points Program*, https://www.joinklover.com/earn-points (last visited Apr. 12, 2025).

FILED DATE: 4/18/2025 11:35 AM 2025CH04364

(charged by the providers to access these products) and having more of their paycheck automatically withdrawn on payday to repay their loans, making workers increasingly reliant on these predatory products.

67.     The CRL has studied this phenomenon, known as "Loan Stacking," and described its prevalence among EWA users and the harms associated with the practice:

> Because direct-to-consumer loans are not tied to employer payroll information, borrowers may receive loans from multiple lenders at once. Nearly half (48%) of consumers use multiple EWA companies, often simultaneously. A survey of low-income workers receiving government benefits found that 60% used a direct-to-consumer app and that the "vast majority" of the workers used multiple apps, averaging 2.45 apps used per person. This practice also increases the risk of overdraft fees when multiple loans become due in the same pay cycle and reduces the consumer's available funds on payday. All of these factors work to further trap consumers in a cycle of debt and increase reliance on loan products.[32]

68.     From a targeted marketing perspective, however, this cross-marketing strategy makes sense. EWA providers generally target the same market—consumers living paycheck to paycheck who struggle to pay living expenses and are often in need of instant liquidity. While Klover profits from encouraging its users to take out additional EWA payday loans from other companies, its users pay the price.

### iii.     EWA Providers Utilize Strict Underwriting Procedures and, Consequently, Almost Always Collect

69.     While EWA products are financially disastrous for customers, they have proven profitable for the companies offering them. EWA providers maximize profits by using exacting underwriting procedures that ensure cash advances, and the fees that accompany them, are timely repaid through automated bank account debits that borrowers authorize when taking out the loans.

70.     Not everyone who creates a Klover account and connects their bank account will qualify for a cash advance. To be eligible for an advance, borrowers must meet minimum qualifications set by Klover.

---

[32] Kushner, Burks, Farahl, *Paying to be Paid: Consumer Protections Needed for Earned Wage Advances and Other Fintech Cash Advances*, CTR. FOR RESPONSIBLE LENDING, at 5 (Oct. 2024).

FILED DATE: 4/18/2025 11:35 AM 2025CH04354

71.     To determine whether a borrower is creditworthy, and decide how much credit to extend in the first place, Klover requires users to connect their accounts to Klover through a third-party service called Plaid.[33] Plaid partners with Klover and other fintech companies to allow them to view data in customers' accounts. Plaid allows Klover to "[q]uickly verify assets and income" of Klover users, providing "real-time insights into a borrower's income and employment in seconds with a breakdown of earnings from salaries, gig work, and more."[34]

72.     Klover's website identifies basic eligibility requirements for its customers as follows. To be eligible for an advance, Klover advises its customers must:

- Have at least three direct deposits in your primary checking account (savings accounts not accepted)

- Your last three deposits must be consistent (no gaps) and made within the last 60 days

- Be paid weekly or bi-weekly (every 7 or 14 days) — we do not support daily, monthly or semi-monthly pay schedules

- Have matching payroll names on all paycheck deposits — spelling must be consistent

- Be paid by the same employer for all deposits

- Paychecks must come from an employer — not a loan or paycheck advance service (e.g., DailyPay, Earnin, Dave, Brigit)

- Deposits must not be cash, ATM deposits, transfers, Venmo, PayPal, CashApp, etc.

- Use a checking account that has been active and in good standing for at least 90 days.[35]

---

[33] Users signing up for a Klover account through the app are shown a screen directing the user to link their bank account.
[34] *Plaid Solutions: Credit*, Plaid.com, https://plaid.com/solutions/credit/ (last visited Mar. 23, 2025).
[35] *Eligibility requirements*, Klover, https://joinklover.zendesk.com/hc/en-us/articles/360034739471-Eligibility-requirements (last visited Apr. 12, 2025).

17

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

73.     Klover advises on its website that its system will only recognize direct deposits as "paychecks" if each deposit is at least $250.00. Thus, each paycheck must exceed this amount to be eligible for Klover cash advances.

74.     Klover uses its real-time insight into customer accounts to ensure borrowers will have sufficient funds to repay their loans on payday and schedule debits on the payday immediately following any given loan, ensuring their loans are paid as soon as funds become available.

75.     Klover's underwriting process is detailed and considers many factors. Klover continually adjusts eligibility and maximum withdrawal amounts depending on the individual's borrowing history and financial health (as gleaned through Plaid).

76.     Klover also incentivizes its customers to use the app as much as possible, rewarding frequent users with points (which are earned by, *inter alia*, using the app consistently, watching advertisements, signing up for services from Klover's partners, and sharing personal information) which can be used to take out cash advances.

77.     Klover's underwriting process is both rigorous and continual. Klover uses algorithms and automated processes to determine customer eligibility (for any cash advance, and to set limits) on an ongoing basis, and advises users that "**eligibility and advance amounts can change daily** based on your **bank activity**, and advances are available for a limited time."

78.     Qualifying for a cash advance is by no means guaranteed. Many thousands of users who create a Klover account and provided all the information (including sensitive demographic information and bank account access) requested were deemed by Klover unqualified for a cash advance.

79.     That is, after reviewing borrowers' financials, Klover determines many of its customers are not credit-worthy and declines to offer them cash advance access.

80.     For borrowers who qualify, Klover strictly monitors their financial health to determine whether they are eligible and, if so, how much credit to extend based on borrowers' default risk and ability to repay. Klover modifies the amount it makes available to its customers to take as a cash advance based on "changes in your financial data" (*i.e.*, financial health),

18

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

"missing or inconsistent paycheck data," "a recent job change," or "a paycheck deposit that doesn't align with your usual pay cycle."

81.     Through its constant underwriting process, Klover extends loans to borrowers only when it is confident they will repay.

82.     For qualifying borrowers, Klover generally begins by offering relatively low amounts of credit: first-time users are often eligible for a small amount, like $10.00 or $20.00.

83.     Borrowers obtain greater access to credit—*i.e.*, Klover raises their maximum loan limit—by consistently paying off loans to Klover on time, improving their financial health (which Klover monitors through the borrowers' bank balance, spending behavior, repayment history, and income), and participating in Klover's points program.

84.     These underwriting methodologies—extending credit only to those who will repay, and only in amounts that are likely to be repaid—are precisely the same methods used by traditional credit issuers, like banks. "US credit card lenders individualize interest rates and credit limits according to assessments of customers' default risk."[36]

85.     In addition to these loan qualification procedures, borrowers must link their bank account (that receives a consistent source of directly deposited income) to the Klover app and authorize Klover to automatically debit their linked account on their next payday for the amount of the loan plus any Express Fees and tips incurred in the transaction.

86.     Klover requires users to agree that if Klover detects insufficient funds (through its Plaid access) to process a repayment, Klover may instead attempt to collect a partial payment toward the balance owed. Thereafter, Klover will continue to monitor the users'

---

[36] Matcham, *Risk-Based Borrowing Limits in Credit Card Markets* (Mar. 10, 2015), https://willmatcham.com/img/main_rbbl_matcham_2024_08_15.pdf; *see also* Dey, Mumy, *Determinants of Borrowing Limits on Credit Cards*, Fed. Reserve Bank of Boston (2006), ("Publicly available information about borrowers' creditworthiness helps banks sort their client pool into broad risk classes by way of their credit scoring systems. . . . Profit-maximizing banks choose to provide exactly the amount of credit to their borrowers that maximize their expected profits."), https://www.bostonfed.org/-/media/Documents/events/payment-choice/papers/Dey.pdf; *What are credit limits?*, Armed Forces Bank (Apr. 4, 2024) ("Financial institutions grant credit limits that allow you to use credit . . . while ensuring you can manage your payments."), https://www.afbank.com/article/what-are-credit-limits-and-how-are-they-determined.

FILED DATE: 4/18/2025 11:35 AM    2025CH04354

accounts until it detects funds have been added, at which point it will attempt to collect the rest of the money owed (or another partial payment).

87.    During the cash advance request process, Klover requires users to agree to the following: "[Y]ou authorize Klover Holdings, Inc. and its affiliates to debit or withdraw [loan amount] from [connected bank] on or after [the scheduled repayment date.]"

88.    When a user requests a Klover cash advance, the app automatically schedules the repayment for the borrower's next payday.

89.    The Klover app does not include a mechanism to cancel a cash advance repayment once an advance has been issued.

90.    In addition, the Klover app does not allow a user to delete or remove a connected bank account from their Klover profile (which users must authorize Klover to debit for loan repayments when they take an advance) once they have taken out a loan. Accordingly, Klover deprives users of a mechanism for cancelling a loan repayment.

91.    Failure to pay back a Klover loan results in suspension of the borrower's account until the outstanding balance is paid.

92.    Klover ensures repayment through pre-authorized debits and the design of its app. And if a borrower is unable to repay a loan, Klover prevents them from using the product—which cash-strapped customers are often *dependent on*—until the loan is repaid.

93.    Through these underwriting procedures and policies, Klover ensures it will be able to automatically deduct the sum of the cash-advance loan amount (the loan principal), plus any additional charges, from the linked account as soon as the borrower's next payday is deposited.

94.    In sum, Klover's underwriting process requires, before any money changes hands, that borrowers: (1) demonstrate they receive regular, consistent income (2) in an amount above $250.00 per pay period and sufficient to cover existing obligations *and* a Klover cash advance; (3) link the bank account to which direct deposits are received to Klover's app through Plaid; (4) authorize Klover to automatically debit the linked accounts on the

20

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

borrower's payday in an amount that is equal to the cash advance the borrower receives (the principal loan amount) plus fees; and (5) be current on all prior cash advances.

95.    These debt collection methods are so successful that EWA lenders recoup their advances at least 97% of the time using these tactics.[37]

**B.    Klover's Loans to Plaintiff**

96.    Plaintiff Moss is currently an active-duty Staff Sergeant in the U.S. Army stationed at Joint Base Lewis-McChord in Washington.

97.    He has been an active duty servicemember since January 2017 and will remain on active duty until at least November 2025.

98.    Klover extended consumer credit to Plaintiff in the form of Klover loan transactions like those discussed above.

99.    Sgt. Moss used the loans from Klover for personal, family, or household purposes.

100.    Sgt. Moss paid Klover's finance charges, in the form of Express Fees and "tips", to obtain cash-advance loans from Klover.

101.    A small selection of loans made by KLover to Plaintiff (and accompanying fees) are shown in the below table, with the cost of credit and APR included:

| Date | Principal Amt. | Express Fees | Loan period | APR |
|------|------|------|------|------|
| 1/26/23 – 1/31/23 | $50.00 | $8.49 | 5 days | 1,240% |
| 2/28/23 – 3/14/23 | $50.00 | $5.89 | 14 days | 307% |
| 3/31/23 – 4/13/23 | $50.00 | $5.89 | 13 days | 340% |

102.    Sgt. Moss has received many usurious loans from Klover since he started using the service. For much of the relevant period, Sgt. Moss took out a loan each pay period and was forced to take out *another loan* immediately after repayment of his last loan.

---

[37] Devina Khanna and Arjun Kaushal, *Earned Wage Access and Direct-to-Consumer Advance Usage Trends*, Fin. Health Network (April 2021) at 2, available at https://cfsi-innovation-files-2018.s3.amazonaws.com/wp-content/uploads/2021/04/26190749/EWA_D2C_Advance-_sage_Trends_FINAL.pdf.

103.     Because of the high fees charged by Klover and other EWA providers, Sgt. Moss has engaged in the type of "Loan Stacking" that Klover encourages in its app.

104.     The fees attendant to Defendant's loans (including, *inter alia*, Express Fees and tips) are immediately and directly connected to Klover's extensions of credit to Plaintiff and the putative classes.

105.     Further, Klover's credit agreement required Sgt. Moss to purportedly waive his right to a jury trial and waive his right to participate in a class action in violation of 10 U.S.C. § 987(e)(2).

106.     Klover's credit agreement also failed to include mandatory MLA loan disclosures in violation of 10 U.S.C. § 987(c) and TILA.

107.     Finally, by requiring pre-authorized debits and direct bank account access (through Plaid and pre-authorized collection attempts), Klover uses a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation in violation of 10 U.S.C. § 987(e)(5).

   **C.     Klover Violates the MLA and the TILA**

108.     The MLA prohibits a creditor from obligating a "Covered Member" to a loan that exceeds 36% MAPR. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4.

109.     A "Covered Member" under the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

110.     Sgt. Moss and the MLA Class Members are subject to the protections and limitations imposed by the MLA. The MLA protects any consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a member of the armed forces or a dependent of a Covered Member (as defined in 32 CFR §§ 232.3(g)(2) and (g)(3)).

111.     Sgt. Moss is a Covered Member with respect to his loan agreements with Klover

22

because he took out the loans while an active-duty service member for personal, family or household purposes.

112. Klover is a "creditor" subject to the requirements and limitations imposed by the MLA because it engages in the business of extending consumer credit to Covered Members. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

113. The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and not subject to any statutory exception. 32 C.F.R. § 232.3(f)(1)(i); 10 U.S.C. § 987(i)(6).

114. Klover violates the MLA in at least five distinct ways: By (1) charging interest above the 36% statutory MAPR rate cap; (2) failing to provide any credit disclosures required by the MLA; (3) including a Class Action Ban and Waiver of Jury Trial; (4) including a mandatory binding arbitration clause; and (5) using a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. See 10 U.S.C. §§ 987(b), (c) & (e)(2), (3), (5).

115. As a result of Klover's failure to provide substantially any of the disclosures required by TILA, Klover also violates 15 U.S.C. § 1638.

VII.    **CLASS ACTION ALLEGATIONS**

116. Plaintiff brings this class action on behalf of himself and all other persons similarly situated and the general public. The proposed "MLA Class" and the "TILA Class" (collectively the "Classes") are defined as follows:

> **MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with Klover to use its "Klover advance" (or substantially similar) product, in which Klover was paid a finance charge (including, without limitation, an Express Fee or tip).

> **TILA Class**: All individuals in the United States that entered into an agreement with Klover to use its "Klover advance" (or substantially similar) product, in which Klover was paid a finance charge (including, without limitation, an Express Fee or tip).

23

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

117.     Expressly excluded from the Classes are: (a) any Judge presiding over this action and members of their families; (b) Klover and any entity in which Klover has a controlling interest, or which has a controlling interest in Klover, and its legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Classes.

118.     Sgt. Moss reserves the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

### Numerosity and Ascertainability

119.     Plaintiff is unable to state the precise number of members of the classes because such information is in the exclusive control of Klover. Klover's scheme has harmed and continues to harm the members of the Classes. The members of the proposed Classes are so numerous that joinder of all members is impracticable. Klover has made at least hundreds of thousands of loans, and Sgt. Moss estimates there are, at least many thousands of consumers in the MLA Class and TILA Class. As a result, Plaintiff believes that the total Classes each number in (at least) the thousands, thus members of the Classes are so numerous that joinder of all class members is impracticable. The exact size of the proposed classes, and the identity of the members thereof, will be readily ascertainable from the business records of Klover.

120.     The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class Members are readily identifiable from information and records in Klover's possession, custody, or control.

### Commonality

121.     There are common questions of law and fact affecting the rights of each Class member and common relief by way of damages. The harm that Klover has caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

- Whether Sgt. Moss and the MLA Class members are Covered Members subject to the protections and limitations of the MLA;

24

FILED DATE: 4/18/2025 11:35 AM 2025CH04354

- Whether Klover is a "creditor" subject to the protections and limitations of the MLA;

- Whether Klover's loans constitute an extension of "consumer credit" subject to the protections and limitations of the MLA and TILA;

- Whether Klover entered into standard form loan agreements with Covered Members;

- Whether Klover's loans exceed the MLA statutory rate cap of 36% MAPR;

- Whether Klover failed to provide required credit disclosures in violation of the MLA;

- Whether Klover's standard form loan agreements contain a class action waiver provision or jury trial waiver provision in violation of the MLA;

- Whether Klover's standard form loan agreements contain an arbitration clause in violation of the MLA;

- Whether Klover failed to provide required credit disclosures in violation of TILA;

- Whether each month Klover charged interest to Sgt. Moss and Class Members it restarted the statute of limitations under the MLA;

- Whether each month that Sgt. Moss and the Class Members paid money to Klover it restarted the statute of limitations under the MLA;

- Whether Class members are entitled to actual or statutory damages for the aforementioned violations and, if so, in what amounts;

- Whether Klover should be enjoined from continuing its lending practices in the manner challenged herein;

- Whether Klover is subject to punitive damages, and, if so, the proper measure of such damages and remedies to which Sgt. Moss and the MLA Class are entitled under 10 U.S.C. § 987(f)(5); and

- Any declaratory and/or injunctive relief to which the Classes are entitled.

25

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

**Typicality**

122.     The claims and defenses of Sgt. Moss are typical of the claims and defenses of the MLA Class because Sgt. Moss is a Covered Member and loan agreements with Klover are typical of the type of personal, household, or family loans that Klover normally provides to Covered Members. Additionally, Klover uses the same or substantially similar standard form loan agreement in all of its lending transactions. The documents involved in the transaction were standard form documents and the violations are statutory in nature. For similar reasons, the claims and defenses of Sgt. Moss are typical of the claims and defenses of the TILA Class. Sgt. Moss suffered damages of the same type and in the same manner as the Classes he seeks to represent. There is nothing peculiar about Plaintiff's claims. Plaintiff has no interests antagonistic to the interests of the other members of the Classes.

**Adequate Representation**

123.     Sgt. Moss will fairly and adequately assert and protect the interests of the Classes. Sgt. Moss has hired attorneys who are experienced in prosecuting class action claims and will adequately represent the interests of the Classes, and Sgt. Moss has no conflict of interest that will interfere with maintenance of this class action.

124.     Plaintiff and his counsel are committed to vigorously prosecuting the action on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Classes.

**Predominance and Superiority**

125.     The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

- The Classes are so numerous as to make joinder impracticable. However, the Classes are not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Classes would

26

FILED DATE: 4/18/2025 11:35 AM 2025CH04354

create a risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct;

- Adjudications with respect to individual members of the Classes could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and

- The claims of the individual Class members are small in relation to the expenses of individual litigation, making a Class action the only procedural method of redress in which Class members can, as a practical matter, recover.

126. The proposed Classes fulfill the certification criteria of 735 ILCS § 5/2-801.

**FIRST CAUSE OF ACTION**
**(Violations of the Miliary Lending Act, 10 U.S.C. § 987, <em>et seq.</em>)**
**(On Behalf of Plaintiff and the MLA Class against Defendant Klover)**

127. Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–126 above.

128. The MLA prohibits a creditor from obligating a "Covered Member" or dependent of a Covered Member (collectively, "Covered Members") to a loan in excess of 36% MAPR.

129. A "Covered Member" in the statute is a "member of the armed forces who is on active duty under a call or order that does not specify a period of 30 days or less."

130. "The MAPR is the cost of the consumer credit expressed as an annual rate." 32 C.F.R. § 232.3. The MAPR includes as relevant here, "finance charges associated with the consumer credit" and "[a]ny fee imposed for participation in any plan or arrangement for consumer credit." 32 C.F.R. § 232.4.

131. Sgt. Moss and the MLA Class Members are "Covered Members," subject to the protections and limitations imposed by the MLA. A Covered Member is a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a Covered Member of the armed forces or a dependent of a

27

Covered Member (as defined in 32 CFR 232.3(g)(2) and (g)(3)).

132.    Sgt. Moss is considered a "Covered Member" with respect to his Klover loan agreements because Sgt. Moss is an active duty service member who is obligated by law to repay loans he took out for personal, family or household purposes.

133.    Klover is a "creditor" subject to the requirements and limitations imposed by the MLA in that it engages in the business of extending consumer credit to Covered Members protected by the MLA. 10 U.S.C. § 987(i)(5); also 32 C.F.R. § 232.3(i).

134.    The underlying loan transactions at issue in this case constitute "consumer credit" subject to the protections and limitations imposed by the MLA because they are "credit offered or extended to a Covered Member primarily for personal, family, or household purposes," subject to a finance charge and outside the ambit of any of the identified exceptions. 32 C.F.R. § 232.3(f)(1)(i); also 10 U.S.C. § 987(i)(6).

135.    Klover charged Sgt. Moss and the MLA Class well above the 36% interest rate cap on their loans, in violation of the MLA.

136.    Klover fails to make all the disclosures required by 10 U.S.C. § 987(c)(1)(A) and 32 C.F.R. § 232.6 in its standard form loan agreements, in violation of the MLA.

137.    Klover's standard form loan agreements include mandatory arbitration agreements in violation of 10 U.S.C. § 987(e)(3).

138.    Klover's standard form loan agreements include class action waivers trial waivers in violation of 10 U.S.C. § 987(e)(2).

139.    Klover uses a method of access to a deposit, savings, or other financial account maintained by the borrower (*i.e.*, pre-authorized debits direct access to bank accounts through Plaid) as security for the obligation in violation of 10 U.S.C. § 987(e)(5).

140.    As a result, Klover violates 10 U.S.C. § 987.

141.    Accordingly, pursuant to 10 U.S.C. § 987(f)(5), on behalf of the MLA Class, Plaintiff seeks an order from the Court awarding statutory damages in the amount of $500 per violation, actual and punitive damages, along with injunctive relief pursuant to 10 U.S.C. § 987(f)(5)(A).

28

FILED DATE: 4/18/2025 11:35 AM    2025CH04354

142.    Plaintiff is entitled to an award of attorneys' fees and costs pursuant to 10 U.S.C. § 987(f)(5)(B).

WHEREFORE, Plaintiff prays for relief as set forth below.

## SECOND CAUSE OF ACTION
### (Violations of the Truth In Lending Act, 15 U.S.C. § 1601, et seq.)
### (On Behalf of Plaintiff and the TILA Class against Defendant Klover)

143.    Plaintiff re-alleges and incorporates by reference herein the allegations set forth in the paragraphs 1–126 above.

144.    TILA and Regulation Z require creditors to provide consumers with specified disclosures for closed-end credit transactions. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17, 1026.18. Klover's loan agreements are closed-end credit transactions because they are not open-end credit transactions. Open-end credit transactions are "a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. § 1602.

145.    Among other requirements, the Regulation prescribes the format of the disclosures, as well as disclosure of certain terms themselves, such as the annual percentage rate and finance charge. 12 C.F.R. §§ 1026.17, 1026.18.

146.    Klover is a creditor whose financing qualifies as "credit" under TILA and Regulation Z, and its loan agreements with consumers are therefore subject to TILA and Regulation Z's disclosure requirements. See 12 C.F.R. § 1026.2(a)(14).

147.    Klover has not provided such disclosures before consummation of the loan agreements.

148.    Klover failed to provide such disclosures to Sgt. Moss and the TILA Class.

149.    As a result, Klover violated TILA and Regulation Z. 15 U.S.C. § 1638; 12 C.F.R. §§ 1026.17 & 1026.18.

150.    Accordingly, pursuant to 15 U.S.C. § 1640, on behalf of the TILA Class, Plaintiff seeks an order from the Court awarding actual damages and statutory damages and

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

FILED DATE: 4/18/2025 11:35 AM 2025CH04354

attorneys' fees and costs.

WHEREFORE, Plaintiff prays for relief as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, on behalf of the Classes, Plaintiff prays for judgment against Klover as follows:

a. That the Court determine that this action may be litigated as a class action and that Plaintiff and his counsel be appointed class representative and class counsel, respectively;

b. That the Court enter judgment against Klover and in favor of Plaintiff and the Classes on all counts;

c. That the Court find and declare that that Sgt. Moss and MLA Class Members' standard form loan agreements violate the MLA;

d. That the Court find and declare that Klover violated the MLA and award Sgt. Moss and MLA Class Members actual damages of not less than $500 per violation pursuant to 10 U.S.C. § 987(f)(5)(A)(i);

e. That the Court award Sgt. Moss and MLA Class Members punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A)(ii);

f. That the Court find and declare that Klover violated TILA and award Sgt. Moss and the TILA Class actual damages and statutory damages pursuant to 15 U.S.C. § 1640;

g. That the Court enjoin Klover from continuing to engage in predatory lending practices in violation of the MLA and TILA;

h. That Klover be required by this Court's Order to compensate Plaintiff's counsel for their attorneys' fees and costs of suit, and that Klover be ordered to bear the cost of notice to the absent class members, as well as the administration of any common fund;

i. That the Court award interest as allowable by law;

j. That the Court award reasonable attorneys' fees as provided by applicable

30

FILED DATE: 4/18/2025 11:35 AM   2025CH04354

law, including *inter alia* under the MLA, the TILA;

k.  That the Court award all costs of suit; and

l.  That the Court award such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of each and every cause of action so triable.

Dated: April 18, 2025                    Respectfully submitted,

*/s/ Courtney Ross Brown*
Courtney Ross Brown (6340021)
cbrown@cbplaw.com
Randall K. Pulliam (*pro hac vice forthcoming*)
rpulliam@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, AR 72207
Phone: (501) 312-8500

Joshua Jacobson (*pro hac vice forthcoming*)
joshua@jacobsonphillips.com
JACOBSON PHILLIPS, PLLC
2277 Lee Road, Ste. B
Winter Park, FL 32789
Phone: (321) 447-6461

*Attorneys for Plaintiff Terrance Moss
and the Proposed Classes*

31

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 14

FILED DATE: 4/18/2025 3:39 PM    2025CH04354

FILED
4/18/2025 3:39 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH04354
Calendar, 14
32343850

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### CHANCERY DIVISION

TERRANCE MOSS, on behalf of himself and
the proposed class,

    *Plaintiff,*

        v.

KLOVER HOLDINGS, INC.,

    *Defendant,*

Case No. 2025CH04354

Hon. Quish, Clare J.

Calendar 14

Hearing Date: 6/17/2025 9:30 AM

### MOTION FOR CLASS CERTIFICATION AND MEMORANDUM IN SUPPORT

Plaintiff Terrance Moss, through counsel, moves this Court for an order certifying this case

as a class action under Illinois Code of Civil Procedure Section 2-801. Plaintiff requests that the

Court enter and continue the motion until after discovery relating to class certification, at which

time Plaintiff will submit a more detailed supporting memorandum of points and authorities.[1]

### INTRODUCTION

The Military Lending Act, 10 U.S.C. §§ 987 ("MLA") imposes an interest rate cap of 36%

on loans extended to active duty servicemembers in the armed forces ("Covered Member" as that

term is defined under 10 U.S.C. § 987(i)(1)). It also requires specific credit disclosures to be made

to Covered Members and prohibits class action bans, jury waivers and mandatory arbitration

clauses from being included within credit agreements extended to Covered Members. Klover

Holdings, Inc. charges interest above the 36% statutory MAPR cap, does not provide MLA

---

[1]Plaintiff files this motion before discovery to prevent Defendant from attempting to moot
Plaintiff's representative claims by tendering an offer for the full amount of their individual
damages while leaving the proposed Class without relief and subject to further and ongoing
harm. *See Joiner v. SVM Mgmt.*, 2020 IL 124671 (holding "that an effective tender made before
a named plaintiff purporting to represent a class files a class-certification motion satisfies the
named plaintiff's individual claim and moots her interest in the litigation.").

FILED DATE: 4/18/2025 3:39 PM   2025CH04354

required disclosures, and includes a class action ban, jury trial waiver, and mandatory arbitration clause in its consumer credit agreements extended to Covered Members. Accordingly, Plaintiff filed suit seeking statutory damages as authorized by the MLA and TILA. ECF No. 1.

Plaintiff's claims should be certified on behalf of the class proposed below. Defendant acted uniformly toward the Class: (1) It charged every Covered Member over the 36% MAPR cap. Compl. ¶ 6; (2) It failed to provide each Covered Member the required MLA credit disclosures. Compl. ¶ 6; (3) It included a class action ban and jury trial waiver in its credit agreements extended to Covered Borrowers. Compl. ¶ 6; (4) It included a mandatory binding arbitration clause in its credit agreements extended to Covered Members; and (5) it uses a method of access to a deposit, savings, or other financial account maintained by the borrower as security for the obligation. Compl. ¶ 6. With such uniformity, certification is proper under Section 2-801.

Accordingly, Plaintiff seeks to certify the following classes:

**MLA Class**: All Covered Members and dependents of Covered Members who entered into an agreement with Klover to use its "Klover advance" (or substantially similar) product, in which Klover was paid a finance charge (including, without limitation, an Express Fee or tip).

**TILA Class**: All individuals in the United States that entered into an agreement with Klover to use its "Klover advance" (or substantially similar) product, in which Klover was paid a finance charge (including, without limitation, an Express Fee or tip).

Compl. ¶ 116.

## FACTS

Defendant Klover Holdings, Inc. ("Klover"), is headquartered in Chicago, Illinois and offers and enters into loan agreements with Covered Members nationwide. Compl. ¶ 11. During the relevant period, Klover extended consumer credit to Plaintiff in the form of "Klover advance" loan transactions which exceeded the 36% MLA MAPR cap. Compl. ¶ 96-107. Klover included a class action ban and jury trial waiver in its agreement with Plaintiff and did not make the required

FILED DATE: 4/18/2025 3:39 PM   2025CH04354

MLA disclosures to Plaintiff. *Id.* Klover also included a mandatory arbitration clause in its consumer credit agreement with Plaintiff. *Id.* Klover acted in a similar manner towards all Covered Members it extended consumer credit to in the relevant period. *Id.* ¶ 108-115.

Additionally, Defendant violated the Truth in Lending Act ("TILA") by failing to provide Covered Members with substantially any of the disclosures TILA requires.

## ARGUMENT

Class certification is governed by Illinois Code of Civil Procedure Section 2-801. Under that rule, a certifying Court must find:

(1)    The class is so numerous that joinder of all members is impracticable.

(2)    There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members.

(3)    The representative parties will fairly and adequately protect the interest of the class.

(4)    The class action is an appropriate method for the fair and efficient adjudication of the controversy.

735 ILCS 5/2-801. As detailed below, the proposed Classes pass the test.

**A.    The Classes are sufficiently numerous.**

A class is "so numerous that joinder of all members is impracticable" if "such a large number of plaintiffs in a single suit would render the suit unmanageable and, in contrast, multiple separate claims would be an imposition on the litigants and the courts." *Gordon v. Boden*, 224 Ill. App. 3d 195, 200 (Ill. App. Ct. 1991).

Here, Defendant extends consumer credit to Covered Members nationwide, entering into millions of credit transactions, placing thousands of Covered Members in the classes as defined here. Compl. ¶ 11, 116, 119. Thus, the Court has "an ample basis" to find that "joinder of all

FILED DATE: 4/18/2025 3:39 PM   2025CH04354

members is impracticable." *Carrao v. Health Care Serv. Corp.*, 118 Ill. App. 3d 417, 427 (Ill. App. Ct. 1983); *Maxwell v. Arrow Fin. Servs.*, No. 03-cv-1995, 2004 WL 719278, at *2 (N.D. Ill. Mar. 31, 2004) ("The court is permitted to make common sense assumptions that support a finding of numerosity.").

**B.      Common issues predominate.**

Common questions must "predominate over any questions affecting only individual [class] members." 735 ILCS 5/2-801(2). Common questions exist when the members are aggrieved by similar misconduct. *Miner v. Gillette Co.*, 87 Ill. 2d 7, 19 (Ill. 1981). They predominate when they "generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (cleaned up).

The MLA requires a 36% MAPR cap on consumer credit extended to Covered Members and that credit disclosures be provided in consumer credit agreements. 10 U.S.C. §§ 987(b), (c) & (e)(2), (3), (5). It also prohibits class action bans, jury trial waivers and mandatory arbitration clauses from being included in consumer credit agreements with Class members. *Id.*

MLA claims naturally raise common questions: Did Defendant extend consumer credit to Covered Members? Did Defendant's consumer credit agreements have an MAPR above 36%? Did Defendant include the required MLA credit disclosures in its consumer credit agreements? Did Defendant include class action bans and jury trial waivers in its consumer credit agreements? Did Defendant include mandatory arbitration clauses in its consumer credit agreements? Consequently, is Defendant liable for statutory damages under the MLA?

TILA claims also naturally raise common questions: Did Defendant include the disclosures required by TILA in its consumer credit agreements? Consequently, is Defendant liable for statutory damages under TILA?

FILED DATE: 4/18/2025 3:39 PM    2025CH04354

Defendants' uniform conduct dictates common answers to those questions. Defendant extended consumer credit to Plaintiff and each class member in the form of Klover advance loan transactions. Compl. ¶ 121, 125. It did not include the disclosures required by the MLA or TILA in its consumer credit transaction agreements. Compl. ¶ 6. Defendant also included class action bans, jury trial waivers, and mandatory arbitration clauses in its consumer credit agreements extended to class members. *Id.* Plaintiff obtained consumer credit from Klover in the form of Klover loan transactions, as did other Class members, *Id.*, so Defendants' failure to comply with the MLA and TILA can be adjudicated once and for all. Common issues therefore predominate as required.

## C.    Plaintiff is an adequate representative.

To "ensure that the claims of the class representatives have the same essential characteristics as the claims of the class at large," *Van v. Ford Motor Co.*, 332 F.R.D. 249, 280 (ND Ill. 219), a class is permissible if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

Additionally, to ensure "that all class members will receive proper, efficient, and appropriate protection of their interests in the presentation of the claim," *Purcell and Wardrope Chtd. v. Hertz Corp.*, 175 Ill. App. 3d 1069 1078 (Ill. Ct. App. 1988), a movant must show that they and their counsel "will fairly and adequately protect the interest of the class." 735 ILCS 5/2-801(3).

Here, Plaintiff's claims have the same factual and legal bases as other Class members and Plaintiff entered into the same consumer credit transaction agreement with Klover as the Class members. Compl. ¶ 98. Consequently, Defendants' conduct has resulted in identical injuries to

FILED DATE: 4/18/2025 3:39 PM    2025CH04354

Plaintiff and Class members. Compl. ¶ 122. Thus, Plaintiff's claims are typical of the proposed Class. *Id.*

Plaintiff has retained counsel experienced in class actions. Compl. ¶ 123-124. Plaintiff and Plaintiff's counsel are committed to vigorously litigating this action on behalf of the Classes and have the resources to do so. *Id.* Neither Plaintiff nor Plaintiff's counsel have any interest adverse to the Classes. *Id.* Plaintiff will therefore adequately represent the Classes.

**D.    Class proceedings are appropriate.**

Finally, to show class proceedings appropriate for resolving the case, 735 ILCS 5/2-801(4), Plaintiff must show that a class action "(1) can best secure the economies of time, effort and expense, and promote uniformity; or (2) accomplish the other ends of equity and justice that class actions seek to obtain." *Gordon*, 224 Ill. App. 3d at 203. In practice, a "holding that the first three prerequisites of section 2-801 are established makes it evident that the fourth requirement is fulfilled." *Id.* at 204.

Here, class litigation would serve the ends of efficiency and consistency of adjudication because class treatment of common questions conserves the Court's and Parties' resources. Compl. ¶ 125. Sealing the deal is the fact that the Class members' claims would be too expensive to bring individually, and Class members would be left with inadequate remedies. *Id.* Thus, the "class action is the only practical means for class members to receive redress." *Gordon*, 224 Ill. App. 3d at 204 (quotation omitted).

## CONCLUSION

As detailed above, this case is appropriate for class certification. Discovery will prove as much. Accordingly, Plaintiff moves the Court to: (1) enter and reserve ruling on this motion; (2) allow for discovery on class-certification issues; (3) grant Plaintiff leave to file an amended

supporting memorandum upon completion of class discovery; (4) certify the classes after full

briefing; and (5) provide all other and further relief that is equitable and just.

Dated: April 18, 2025

Respectfully submitted,

/s/ Courtney Ross Brown
One of Plaintiff's Attorneys

Courtney Ross Brown (6340021)
cbrown@cbplaw.com
Randall K. Pulliam (*pro hac vice forthcoming*)
rpulliam@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
One Allied Drive, Suite 1400
Little Rock, AR 72207
Phone: (501) 312-8500

Joshua Jacobson (*pro hac vice forthcoming*)
joshua@jacobsonphillips.com
JACOBSON PHILLIPS, PLLC
2277 Lee Road, Ste. B
Winter Park, FL 32789
Phone: (321) 447-6461

*Attorneys for Plaintiff Terrance Moss
and the Proposed Classes*

FILED DATE: 4/18/2025 3:39 PM   2025CH04354

7



**null / ALL**
**Transmittal Number: 31276779**
**Date Processed: 04/23/2025**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Brian Mandelbaum<br>Klover Holdings, Inc.<br>222 W Hubbard St<br>Ste 210<br>Chicago, IL 60654-6896 |

| | |
|---|---|
| **Entity:** | Klover Holdings, Inc.<br>Entity ID Number  3943428 |
| **Entity Served:** | Klover Holdings, Inc. |
| **Title of Action:** | Terrance Moss, individually and on behalf of all others similarly situated vs. Klover Holdings, Inc. |
| **Matter Name/ID:** | Terrance Moss, individually and on behalf of all others similarly situated vs. Klover Holdings, Inc. (17224816) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Class Action |
| **Court/Agency:** | Cook County Circuit Court, IL |
| **Case/Reference No:** | 2025CH04354 |
| **Jurisdiction Served:** | Illinois |
| **Date Served on CSC:** | 04/22/2025 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Carney Bates & Pulliam<br>501-312-8500 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

FILED
4/23/2025 12:40 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH04354
Calendar, 14
32397716

FILED DATE: 4/23/2025 12:40 PM   2025CH04354

ClientCaseID:                79602               CaseReturnDate:   4/22/25

Affidavit of  A PRIVATE INVESTIGATOR

# COOK COUNTY STATE OF ILLINOIS, CIRCUIT COURT

Case Number **2025-CH-04354**

I, JOHN  PENNELL

FIRST DULY SWORN ON OATH STATES THAT I AM OVER 18 YEARS OF AGE AND NOT A PARTY TO THIS SUIT AND
LICENSED AS A PRIVATE DETECTIVE (LICENSE # 115.002074) UNDER THE PRIVATE DETECTIVE ACT OF 2004.

## CORPORATE SERVICE

THAT I SERVED THE WITHIN   SUMMONS & COMPLAINT
ON THE WITHIN NAMED  DEFENDANT  KLOVER HOLDINGS, INC.
PERSON SERVED  BAYLON ELFGEN, AUTHORIZED AGENT
BY LEAVING A COPY OF EACH WITH THE SAID DEFENDANT ON **4/22/25**

That the sex, race and approximate age of the whom I left the    SUMMONS & COMPLAINT
are as follow:

Sex   MALE      Race   WHITE         Age   23      Height   6'3"       Build   250#         Hair   BRN

LOCATION OF SERVICE    **801   ADLAI STEVENSON DR.
SPRINGFIELD, IL, 62703**

Date Of Service    **4/22/25**          Time of Service   **3:45 PM**

JOHN  PENNELL                          4/22/2025
**A PRIVATE INVESTIGATOR**
PRIVATE DECTECTIVE # 115.002074

Under penalties of perjury as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned
certifies that the statement are true and correct, except as to matters therein stated to be on information and belief and such
matters the undersigned certifies as aforesaid that he/she verily believes same to be true.

Date: 5/7/2025

CIRCUIT COURT OF COOK COUNTY
CHANCERY DIV., RM. 802 DALEY CTR.
CHICAGO, IL. 60602

Klover Holdings, Inc.
Illinois Corporation Service Company801 Adlai Stev
Springfield
IL - 62703

CASE: 2025CH04354 / CALENDAR: 14
Moss, Terrance  -vs- Klover Holdings, Inc.,

YOUR COURT DATE IS ON Tuesday  June  17  2025 AT 09:30 AM
** PLEASE DO NOT COME DOWN TO THE COURTHOUSE **
IN ORDER TO APPEAR BY TELEPHONE OR VIDEO FOR YOUR
 USE THE FOLLOWING ZOOM INFORMATION:

ZOOM ACCESS CODE: 953 7174 9534   PASSWORD: 253498

INSTRUCTIONS FOR ACCESSING ZOOM BY VIDEO ARE AVAILABLE AT
HTTP://WWW.COOKCOUNTYCOURT.ORG/ AND AT HTTPS://ZOOM.US/
TO ACCESS ZOOM BY PHONE, CALL 312-626-6799 THEN ENTER THE
THE ACCESS CODE AND PASSWORD LISTED ABOVE.

IF YOU HAVE ANY QUESTIONS PLEASE CONTACT THE COURT
EMAILING CCC.CHANCERYCALENDAR14@COOKCOUNTYIL.GOV
OR CALLING 312-603-3733