IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TERRANCE MOSS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 25-cv-5758 ) ) Honorable Joan B. Gottschall |
| KLOVER HOLDINGS, INC., | ) ) |
| Defendant. | ) ) ) |

### MEMORANDUM OPINION AND ORDER

Defendant Klover Holdings, Inc. has filed a motion to dismiss plaintiff Terrance Moss's national class action complaint for failure to state a claim. *See* Mot. Dismiss, Dkt. No. 26; Mem. Supp. Mot. Dismiss, Dkt. No. 27; Opp'n Mot. Dismiss, Dkt. No. 37; Reply Supp. Mot. Dismiss, Dkt. No. 42. The court denies the motion for the reasons discussed herein.

### *I. Motion Standard*

Defendant's Federal Rule of Civil Procedure 12(b)(6) motion tests the complaint's sufficiency rather than the case's merits. *See Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337–38 (7th Cir. 2024). The notice pleading standard adopted by the Federal Rules of Civil Procedure requires every complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To withstand a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A complaint satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In contrast, "a formulaic recitation of the elements of a cause of action" does not satisfy the plausibility standard; nor do "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (quotations omitted).

On a Rule 12(b)(6) motion, the court must accept the complaint's well-pleaded facts as true and draw reasonable inferences in the plaintiff's favor. *See Farhan v. 2715 NMA LLC*, 161 F.4th 475, 478 (7th Cir. 2025); *Lazarou v. Am. Bd. of Psychiatry & Neurology*, 158 F.4th 854, 858 (7th Cir. 2025). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

## II. BACKGROUND

Plaintiff Moss, who is a Staff Sergeant in the U.S. Army, pleads claims under the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 *et seq.,* and the Military Lending Act (MLA), 10 U.S.C. § 987. *See* Compl. ¶¶ 3, 96–97, Dkt. No. 1-2. The complaint charges that Klover's financial products marketed as "Klover advance" and "Balance Advance" are in substance, if not in form, "garden variety cash advances," that is, payday loans subject to the TILA's and MLA's consumer disclosure requirements and to the MLA's 36% annual interest rate cap. *See* Compl. ¶¶ 2–9, 33–36 (quotation in ¶ 34). Klover maintains in its motion to dismiss that users of its products, which it characterizes as "Non-recourse [cash] advance[]" products, are not legally obligated to repay, so Klover is not extending credit within the meaning of the TILA and MLA. *See* Mem. Supp. Mot. Dismiss 1–2, 8–10.

### A. Klover's Products

Consistent with the Rule 12(b)(6) standard, the court recites the facts alleged in the complaint in the light most favorable to plaintiff. Klover identifies itself as a financial technology, or fintech, company. *E.g.*, Compl. ¶ 36. It markets Klover advance as "a cash advance from the Klover app." "You can access up to $200," Klover tells users, "even if your payday is 2 weeks away." Compl. ¶ 36 (quoting unspecified marketing materials). The description of Klover's app in the Apple app store states that Klover is not making payday loans and that it does not charge interest or late fees. Compl. p. 14 n.25 (quoting source not presently in the record). As Klover stresses, the terms of service on its website state that users are not obligated to repay a cash advance.

Klover utilizes a third-party company to perform underwriting before issuing a cash advance, resulting in a user's request for a cash advance being by no means guaranteed and a relatively high collection rate for Klover. *See* Compl. ¶¶ 71–86. To receive an advance, a user must authorize Klover's app to deduct funds from the bank account into which the user's paycheck is deposited. Compl. ¶ 37. And the user is further required to authorize Klover to debit from the linked bank account on a scheduled date, which is the user's next payday, or thereafter. *See* Compl. ¶¶ 37, 73–74. The Klover app provides no means of cancelling the scheduled recoupment of a cash advance from the user's linked bank account. Compl. ¶ 89. Klover suggests in its briefing that recoupment can be avoided by removing funds from the bank account or closing it all together. *E.g.*, Mem. Supp. Mot. Dismiss 10, Dkt. No. 27; *but see* Compl. ¶¶ 80–85 (alleging Klover attempts to mitigate this risk). If a cash advance is not repaid, the user's account on the Klover app is suspended until repayment occurs. Compl. ¶ 91.

Klover charges users "expedite fees," which it calls "express fees," for same-day access to a cash advance, and Klover encourages its users to tip for each cash advance. *See* Compl. ¶¶ 39–41, 46–47, 50–52. Klover markets its products to people with poor credit and those living paycheck to paycheck, for whom fast access to a cash advance—by definition, the user has a two-week liquidity problem—is likely to be particularly important for meeting expenses such as the cost of gasoline, unexpected household needs, and unforeseen medical care. *See* Compl. ¶¶ 42–45. Klover users who do not want to wait up to three business days for access to funds must pay an express fee of between $1.99 and $19.99. Compl. ¶¶ 40, 46. These expedite fees, the complaint alleges, are only "notionally optional" for the population Klover is targeting. Compl. ¶ 46.

Regarding tips, Moss alleges that they "serve no purpose whatsoever" and are a Klover profit center. Compl. ¶ 50. Klover allegedly employs behavioral economics techniques to pressure users to tip. *See* Compl. ¶¶ 50–53.

Based on the foregoing allegations, Moss pleads that tips and expedite fees should be treated as finance charges on a payday loan. *See* Compl. ¶ 54. When the tips and expedite fees

3

are treated as finance charges, Moss calculates that the effective annual interest rate on the cash advances he received from Klover often exceeded 300%, and the effective and net rate on one of his advances exceeded 1200%. Compl. ¶ 56; *see also* Compl. ¶¶ 54–55, 101.

The complaint cites a study of users of similar products, a category sometimes referred to as Earned Wage Access (EWA) products. Compl. ¶ 61. Based on the study, Moss alleges, "The end result is a product that traps consumers in cycles of debt, worsens their financial circumstances, leads to more overdraft fees, and creates an ever-increasing reliance on emergency funds from—and the fees that come with—[these types of] loans." Compl. ¶ 60. Klover also sells customer data to advertisers, and it rewards its users with "Klover Points" for completing desired activities, such as sharing personal information and viewing advertisements. *See* Compl. ¶¶ 63–66. The advertisements Klover users view often include promotions for providers of similar cash advance products, the effect of this advertising and point system being to incentivize a user to sign up with more than one EWA cash advance service. *See* Compl. ¶ 65. "Many users who follow Klover's prompts and dutifully sign up for and take out cash advances from other EWA providers end up in an ever-worsening financial condition." Compl. ¶ 66.

**B. The Truth in Lending Act**

"Congress passed [the Truth in Lending Act] to promote consumers' 'informed use of credit' by requiring 'meaningful disclosure of credit terms . . . .'" *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 198 (2011) (quoting 15 U.S.C. § 1601(a)). TILA furthers its objective of allowing consumers meaningfully to compare credit terms by imposing disclosure requirements upon creditors. *See generally Rendler v. Corus Bank*, 272 F.3d 992, 996 (7th Cir. 2001); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010) (collecting citations). TILA's disclosure requirements may be found in the statute itself; in Regulation Z, which implements the TILA; and in binding commentary prepared by the staff of the agency charged with responsibility for Regulation Z. *See Bonte*, 624 F.3d at 463.

Regardless of the type of credit,[1] the TILA sets the same baseline requirements for statutory coverage: a "creditor" and a "consumer credit transaction." *See* 15 U.S.C. §§ 1602(f), 1631(b). The term "credit" means "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h)

**C. The Military Lending Act**

In passing the Military Lending Act, Congress intended to "prevent predatory lending practices against military personnel, that serve to 'undermine military readiness, harm the morale of troops and their families, and add to the cost of fielding an all-volunteer fighting force.'" *Harris v. OneMain Fin.*, 2018 WL 7142126, at *2 (S.D. Ind. June 13, 2018) (citation modified) (quoting *Huntco Pawn Holdings, LLC v. U.S. Dep't of Defense*, 240 F. Supp. 3d 206, 211 (D.D.C. 2016)). Congress provided a variety of civil and criminal remedies and penalties in the MLA. *See* 10 U.S.C. § 987(f) (listing penalties and remedies). Most pertinent to this lawsuit, any person who violates the MLA may be held civilly liable for actual, statutory, and punitive damages, as well as attorney's fees and costs. *See* 10 U.S.C. § 987(f)(5).

The MLA provides, among other things, that a creditor "may not impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a covered member [of the military] or a dependent of a covered member." 10 U.S.C. § 987(b). The 36% maximum annual percentage rate is sometimes called the military annual percentage rate, or MAPR. *E.g.*, 32 C.F.R. § 232.6(a)(1). The MAPR interest rate cap applies to a "creditor who extends consumer credit to a covered member of the armed forces or a dependent of such a member." 10 U.S.C. § 987(a).

---

[1] TILA and Regulation Z impose different disclosure requirements depending on whether an extension of credit is open- or closed-end. *See Rendler v. Corus Bank*, 272 F.3d 992, 996 (citing *Benion v. Bank One, Dayton N.A.*, 144 F.3d 1056, 1057 (7th Cir. 1998) and the separate sections of Regulation Z governing each type of disclosure, 12 C.F.R. §§ 226.17–18 (closed-end credit disclosures), and 12 C.F.R. § 226.5b (open-end credit disclosure)). The distinction between open- and closed-end credit plays no role in the briefing now before the court, however.

Similar to the TILA, the MLA obligates a "creditor" to make required disclosures "[w]ith respect to any extension of consumer credit (including any consumer credit originated or extended through the internet) to a covered member or a dependent of a covered member" of the military. 10 U.S.C. § 987(c)(1). Specifically, the creditor must disclose, orally and in writing, all of the information the TILA requires plus a "statement of the annual percentage rate of interest applicable to the extension of credit," *i.e.*, the 36% MAPR cap. 10 U.S.C. § 987(c)(1)(A)–(B). A regulation implementing the MLA allows a creditor to satisfy the oral disclosure requirement in person or by providing a toll-free telephone number to deliver the required disclosures. *See* 32 C.F.R. § 232.6(d)(2)(i)–(iii). Among other prohibitions, the MLA forbids covered creditors from requiring a covered borrower to submit to arbitration or to waive the borrower's right to legal recourse. 10 U.S.C. § 987(e)(3).

### III. ANALYSIS

Resolving the parties' arguments requires the court to construe provisions of the TILA, the MLA, and both statutes' implementing regulations. "The same basic rules that apply to statutory interpretation apply to regulatory interpretation." *Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 382 (7th Cir. 2020) (citing *Exelon Generation Co. v. Local 15, Int'l Bhd. of Electrical Workers, AFL-CIO*, 676 F.3d 566, 570 (7th Cir. 2012); other citation omitted). When interpreting a statute, the court begins with the statute's text and gives "effect to the clear meaning" of the language of the statute or regulation as written. *Nielen-Thomas v. Concorde Inv. Servs., LLC*, 914 F.3d 524, 528 (7th Cir. 2019) (citing *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017)).

"Statutory terms or words will be construed according to their ordinary, common meaning unless these are defined by the statute or the statutory context requires a different definition," in which event the statutory definition controls. *Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 895 (7th Cir. 2001) (citation omitted).

6

Klover focuses on the meaning of a handful of statutory and regulatory words and phrases—words such as "debt" and "finance charge." However, a statute or regulation must be "read as a whole rather than as a series of unrelated and isolated provisions." *Nielen-Thomas*, 914 F.3d at 528 (citation modified) (quoting *Arreola-Castillo v. United States*, 889 F.3d 378, 386 (7th Cir. 2018)). "Proper statutory construction requires considering 'not only the bare meaning of a word but also its placement and purpose in the statutory scheme.'" *Khan v. United States*, 548 F.3d 549, 554 (7th Cir. 2008) (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)).

Klover makes two arguments. It contends first that its Klover advance products are not extensions of credit to which the TILA and MLA apply because Klover's terms of service disavow that its users have a legally enforceable obligation to repay a cash advance.[2] *See* Mem. Supp. Mot. Dismiss & n.1. Second, Klover contends that its tips and expedite fees, as described in the complaint, do not meet the statutory definition of a "finance charge."

**A. Definitions of Credit and Finance Charge**

The following definitions anchor the analysis. For TILA purposes, "The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). The MLA's definition of "credit" is similar: "Credit means the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h); *see also* 10 U.S.C. § 987(i)(6). With exceptions not relevant here, a "creditor" is defined as a "person who is engaged in the business of extending consumer credit," 10 U.SC. § 987(i)(5)(A)(i); 32 C.F.R. § 232.3(i)(1), or an assignee of such a person, 32 C.F.R. § 232.3(i)(2). MLA regulations incorporate Regulation Z's test for identifying

---

[2] Klover attached to its motion to dismiss a purported copy of its terms and conditions as of July 26, 2021. One of Klover's attorneys retrieved this document from the "wayback machine" available from www.web.archive.org. *See* Decl. of A. Baker ¶ 4, Dkt. No. 28. Klover asks the court to take judicial notice of its purported terms and conditions. *See id.* ¶ 4 n.1. The court need not do so, however, because the parties agree at the complaint stage that Klover users are not contractually obligated to repay a cash advance, and there is no need at this time to construe Klover's terms and conditions. The court notes that Klover has not explained why it selected the 2021 version of its terms and conditions. According to the website in the record, fifty-six versions of Klover's terms and conditions exist. *See* Ex. 1 at 1, Dkt. No. 28-1. Furthermore, the court has no basis for determining whether it has been provided with the version of Klover's terms and conditions in effect when Moss received cash advances.

a consumer credit transaction. *See* 32 C.F.R. § 232.3(i)(3). Specifically, a creditor must satisfy "the transaction standard for a 'creditor' under Regulation Z with respect to extensions of consumer credit to covered borrowers," 32 C.F.R. § 232.3(i)(3), in order to be "engaged in the business of extending consumer credit." 32 C.F.R. § 232.3(i)(1).

The MLA cross-references and incorporates the TILA's definition of "finance charge." Under the TILA definition, a "finance charge" in "any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). Phrased in terms of this definition, Klover's argument is that tips and expedite fees are not incident to the extension of credit, assuming of course that an extension of credit is occurring.

**B. Dictionary Definition**

Neither statute defines the word "debt," which appears in each statute's definition of credit. Klover maintains that the word "debt" limits the reach of the TILA and MLA to transactions involving legally, or perhaps contractually, enforceable obligations to repay. Klover cites no case adopting its suggested construction of the TILA and MLA. Instead, Klover relies on one of the definitions of "debt" in the 1979 edition of Black's Law Dictionary: "a specified sum of money owed by one person to another, including the obligation of the debtor to pay, and the right of the creditor to enforce payment." Black's Law Dictionary 363 (5th ed. 1979), quoted in Mem. Supp. Mot. Dismiss 6 n.7, Dkt. No. 27 (case citation omitted).

Klover's proposed definition of "debt" conflicts with the cases it cites. As Klover acknowledges in its briefing, "courts do at times recharacterize sales transactions as loans (debt)" under the TILA and the MLA. Mem. Supp. Mot. Dismiss 9 (citing *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993)). Klover attempts to distinguish such cases on their facts, but it does not argue that they were wrongly decided insofar as the courts look to the

8

transaction's substance (a pawn broker's loan in the case Klover cites) rather than simply asking whether the repayment obligation would be enforceable under contract law principles. *See id.*

Consistent with Klover's cases, the word "debt" has long been used in the sense of a contractually unenforceable obligation to repay a sum of money that is nevertheless enforceable under equitable theories such as unjust enrichment and promissory estoppel. An older Supreme Court opinion uses the phrase "equitable debt" in this sense. *See Schall v. Camors*, 251 U.S. 239, 247 (1920). Klover has not explained why it believes Congress intended to adopt a narrower construction of "debt" in the TILA and MLA, and at least one court has held that the dictionary definition Klover proffers is not controlling as to the meaning of "credit" in the TILA and the MLA. *Moss v. Cleo AI Inc.*, 799 F. Supp. 3d 1152, 1159 (W.D. Wash. 2025). This court agrees that "debt," as used in the definitions quoted above, is broader than Klover's proposed dictionary definition and therefore looks to the interpretative sources below to construe the term in the context of the facts alleged in the instant complaint.

**C. Agency Interpretations**

The Supreme Court has instructed lower courts "to give special deference to regulations promulgated by the agency charged with the TILA's administration." *Acosta v. Target Corp.*, 745 F.3d 853, 857 (7th Cir. 2014) (citing *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565–66 (1980), and *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 366 (1973)). That agency was the Federal Reserve Board until the passage of the Dodd-Frank Act, which transferred TILA rulemaking authority to the Consumer Financial Protection Bureau. *Dodd-Frank Wall Street Reform and Consumer Protection Act*, Pub. L. No. 111-203, § 1100A, 124 Stat. 1376, 2107–09 (2010); *see also Lopez v. Bank of Orrick*, 2024 WL 6952824, at *3 (N.D. Ill. Sept. 26, 2024) (discussing this statutory and regulatory history).

The pertinent CFPB staff interpretation speaks clearly to the facts alleged in Moss's complaint:

> Payday loans; deferred presentment: Credit includes a transaction in which a cash advance is made to a consumer in exchange for the consumer's

9

> personal check, or in exchange for the consumer's authorization to debit the consumer's deposit account, and where the parties agree either that the check will not be cashed or deposited, or that the consumer's deposit account will not be debited, until a designated future date. This type of transaction is often referred to as a "payday loan" or "payday advance" or "deferred-presentment loan." A fee charged in connection with such a transaction may be a finance charge for purposes of 12 C.F.R. § 1026.4, regardless of how the fee is characterized under state law. Where the fee charged constitutes a finance charge under § 1026.4 and the person advancing funds regularly extends consumer credit, that person is a creditor and is required to provide disclosures consistent with the requirements of Regulation Z.

12 C.F.R. pt. 226, Supp. I, § 226.2(2)(a)(14)(2) (2026).

After briefing closed on the pending motion to dismiss, Klover notified, *see* Notice Suppl. Authority, Dec. 26, 2025, Dkt. No. 75, the court of the CFPB's advisory opinion dated December 23, 2025, which partially repudiated the foregoing interpretation and determined that certain Earned Wage Access products, as defined in the advisory opinion, do not meet Regulation Z's definition of "credit." *See* Truth in Lending (Regulation Z); Nonapplication to Earned Wage Access Products, 90 Fed. Reg. 60069, 60070–71 (Dec. 23, 2025). Klover's notice of supplemental authority included legal argument to the effect that the court owes deference to the December 23, 2025, advisory opinion, but, due to the procedural posture of this case at the time, Moss has not had an opportunity to respond. *See* Notice of Suppl. Authority 1–2, Dec. 26, 2025, Dkt. No. 75; Minute Order, Dec. 29, 2025, Dkt. No. 76.

By its terms, the December 23, 2025, advisory opinion shields putative creditors who, among other criteria, do "not directly or indirectly assess the credit risk of individual workers, including through obtaining and reviewing credit reports or credit scores about the individual workers," and who do "not determine accrued wages based on other information, such as worker representations, or on estimates or predictions of accrued wages." 90 Fed. Reg. at 60071 (defining a covered EWA provider). Moss's complaint plausibly alleges that Klover employs a third-party underwriter, referred to as Plaid, that analyzes users' bank accounts transaction history, interaction data, and other risk factors on a daily basis to determine risk and adjust the

10

amount of money the user may obtain from Klover's products. *See* Compl. ¶¶ 71–74. These allegations suffice at the complaint stage to state a claim that Klover's products do not meet the definitions set out in the December 23, 2025, advisory opinion. *See Burrison v. FloatMe, Corp.*, 2026 WL 444638, at *6 n.5 (D. Mass. Feb. 17, 2026). Thus, the staff interpretation quoted above remains the guidance to which this court is to defer, and that interpretation unambiguously leans toward finding that Klover's products meet TILA's definition of credit.

### D. Judicial Interpretations

No federal court of appeals has construed the TILA or the MLA in the context of an Earned Wage Access product. But the questions presented here—the scope of "credit" and whether tips and expedite fees constitute finance charges—have been litigated before several federal district courts in recent years.

Every federal district court to have confronted arguments similar to those Klover makes here has rejected them and held that the TILA and MLA apply to Earned Wage Access products and that tips and expedite fees like Klover's constitute finance charges, notwithstanding defendants' attempts to characterize their EWA products as non-recourse. *See Russell v. Dave Inc.*, 2025 WL 3691977, at *5 (C.D. Cal. Dec. 12, 2025), appeal docketed, No. 26-12 (9th Cir. Jan. 2, 2026); *Moss v. Cleo AI Inc.*, 799 F. Supp. 3d 1152, 1158–60 (W.D. Wash. 2025); *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 935–36 (N.D. Cal. 2025); *Revell v. Grant Money, LLC*, 2025 WL 3167318, at *9–10 (N.D. Cal. Nov. 5, 2025); *Vickery v. Empower Fin., Inc.*, 2025 WL 2841686, at *5–6 (N.D. Cal. Oct. 7, 2025), appeal docketed, No. 25-6377 (9th Cir. Oct. 9, 2025); *Johnson v. Activehours, Inc.*, 2025 WL 2299425, at *8 (D. Md. Aug. 8, 2025). These cases analyze the statutes' and regulations' text in detail to reject arguments similar to those Klover makes here. *See, e.g.*, *Vickery*, 2025 WL 2841686, at *5–6; *Moss*, 799 F. Supp. 3d at 1160–61.

Rather than recapitulate these sometimes lengthy analyses, this court adopts their reasoning and rejects the arguments Klover advances in its motion to dismiss. In so doing, this

11

court adds its voice to the growing chorus of decisions that have concluded that similar cash advance programs constitute "credit" within the meaning of the TILA and that tips and expedite fees, on facts similar to those alleged in the instant complaint, are plausibly alleged to constitute finance charges. *Russell*, 2025 WL 3691977, at *5.

## IV. CONCLUSION

For the reasons explained above, this court adopts the construction of the TILA and MLA that every federal district court has given those statutes in cases involving Earned Wage Access products. *See supra*, at 9. Accordingly, Moss's complaint states a claim under the TILA and the MLA. Klover's motion to dismiss the complaint for failure to state a claim is denied.

Date: March 5, 2026 /s/ Joan B. Gottschall
United States District Judge